**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**
**The Honorable Michael E. Romero**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 09-24169-MER |
| KEN MCKINNEY, | ) | |
| d/b/a EURO CONSTRUCTION, INC. | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| MARK BUTMAN, and | ) | Adversary No. 09-1638 MER |
| STEVE CLEARY | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KEN MCKINNEY, | ) | Signed/Docketed |
| d/b/a/ EURO CONSTRUCTION, INC. | ) | October 2, 2012 |
| | ) | |
| Defendant. | ) | |

## ORDER

THIS MATTER comes before the Court on the *Complaint for Exception from Discharge*[1] (the "Complaint") filed by Plaintiffs Mark Butman and Steve Cleary (collectively, the "Plaintiffs"), and *Debtor-Defendant, Ken McKinney's Answer to Mark Butman and Steve Cleary's Complaint for Exception from Discharge Including Affirmative Defenses*[2] (the "Answer") filed by Debtor-Defendant Ken McKinney (the "Debtor"). The Court has considered evidence and legal arguments presented by the parties, and hereby makes the following findings of fact and conclusions of law.

## JURISDICTION

The Court has jurisdiction over this matter under 28 U.S.C. §§ 1334 (a) and (b) and 157(a) and (b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) as it involves a determination as to the dischargeability of a

---

[1] Docket No. 1.

[2] Docket No. 5.

particular debt under 11 U.S.C. § 523(a)(2)(A).[3] In addition, the parties stipulated the Court has jurisdiction over this matter and this matter is a core proceeding pursuant to the provisions of 28 U.S.C. §§ 157 and 1334.[4]

**BACKGROUND**

On January 23, 2006, the Debtor met with the Plaintiffs to discuss the Plaintiffs' funding for the development of a construction project known as the Tejon Heights Subdivision (the "Project"). At trial, the Debtor testified he approached Mr. Butman to finance the Project as a lender, not an investor. Mr. Butman then contacted Mr. Cleary to split the financing for the Project. The Debtor admitted he told the Plaintiffs at their initial meeting he had obtained four or five "pre-sales" with respect to the Project. In late February 2006, the parties met again at the office of the Plaintiffs' counsel to review terms for a written agreement.

At the closing held on March 8, 2006, the Plaintiffs, the Debtor, and Euro Construction, Inc. ("Euro")[5] entered into a written Agreement dated March 8, 2006 ("Agreement") in connection with the Project.[6] On the same date, Plaintiffs provided the Debtor with two cashier's checks in the aggregate amount of $235,000.[7] The Debtor admits receiving the Agreement shortly prior to or at the meeting. He stated the Agreement reflected the arrangement reached between the parties. However, he also testified he did not read the entire Agreement prior to signing and was unaware the Agreement contained a warranty regarding pre-sales and executed contracts for purchased homes.

Pursuant to the terms of the Agreement, the Debtor was obligated to pay the Plaintiffs the sum of $15,666.67 per home, at the time construction commenced on each of the 15 single family homes in the Project.[8] The

---

[3] Unless otherwise noted, all future statutory references in the text are to Title 11 of the United States Code.

[4] Complaint, at ¶ 5; Answer, at ¶ 5; Stipulated Pre-Trial Statement ("SPS"), at ¶ 1.

[5] Euro was owned and operated by the Debtor at the time of the signing of the Agreement. SPS, at ¶ 3.

[6] Complaint, at ¶ 6; Answer, at ¶ 6; SPS, at ¶ 2. *See also* Plaintiffs' Exhibit 1. At trial, the parties stipulated to the admission of the Agreement (Plaintiffs' Exhibit 1). *See Minutes of Proceeding* from July 17, 2012 (Docket No. 75).

[7] *See* Plaintiffs' Exhibit 4. The Plaintiffs loaned to the Debtor $117,500 each.

[8] Complaint, at ¶ 10; Answer, at ¶ 10; SPS, at ¶ 4.

Agreement also provided the Plaintiffs with a share of the profits generated by the Debtor from the sale of each home in the Project.[9]

On March 8, 2006, the Debtor and Euro, jointly and severally, executed a Promissory Note dated March 8, 2006 in favor of the Plaintiffs in the original principal amount of $235,000 (the "Note").[10] The Plaintiffs are the holders of the Note.[11] According to its terms, the Note was due and payable on April 1, 2009.[12] The Debtor and Euro have only paid $15,000.00 of the obligation and the balance of the Note is in default.[13] The parties agree the Debtor is indebted to the Plaintiffs in the principal sum of $220,000.00,[14] and the Plaintiffs are creditors of the Debtor pursuant to the Note.[15]

## PROCEDURAL HISTORY

On July 16, 2009 ("Petition Date"), the Debtor filed for relief under Chapter 7 of the Bankruptcy Code. Prior to the Petition Date, Plaintiffs initiated an action against the Debtor and his company in the District Court for the City and County of Denver styled *Mark Butman and Steve Cleary v. Ken McKinney and Euro Construction, Inc.*, Case No. 08-CV-8275. The Debtor filed an answer to the state court complaint in December 2008. The pleadings filed in the this adversary proceeding are ambiguous as to the current status of the state court litigation, but it is clear the litigation was not resolved at the time the Debtor filed his bankruptcy case.

The Debtor listed an unsecured debt to the Plaintiffs in the amount of $245,000.00 on his Amended Schedule F,[16] and he disclosed the pending state

---

[9] Complaint, at ¶ 11; Answer, at ¶ 11; SPS, at ¶ 5.

[10] SPS, at ¶ 6. *See also* Plaintiffs' Exhibit 2. At trial, the parties stipulated to the admission of the Note (Plaintiffs' Exhibit 2). *See Minutes of Proceeding* from July 17, 2012 (Docket No. 75).

[11] Complaint, at ¶ 23; Answer, at ¶ 23; SPS, at ¶ 6.

[12] Complaint, at ¶ 24; Answer, at ¶ 24; SPS, at ¶ 7.

[13] Complaint, at ¶ 25; Answer, at ¶ 25; SPS, at ¶ 8.

[14] Complaint, at ¶ 26; Answer, at ¶ 26; SPS, at ¶ 9.

[15] Complaint, at ¶ 1; Answer, at ¶ 1.

[16] Docket No. 36.

court litigation in his initial Statement of Financial Affairs.[17] On August 21, 2009, the Chapter 7 trustee held the Meeting of Creditors pursuant to § 341.[18] On November 23, 2009, the Plaintiffs filed a proof of claim for an unsecured claim in the amount of $343,403.75, which includes pre-petition accrued interest at 18% ($115,869), and attorneys' fees ($7,534.75).[19]

The Complaint seeks a determination of nondischargeability of the Debtor's debt to the Plaintiffs under "523(a)(2)(A)(B),"[20] and a judgment in favor of the Plaintiffs for the principal amount of the debt, plus interest, attorneys' fees and costs. The Plaintiffs assert the debt under the Note is for money obtained by false pretenses, false representation and/or actual fraud. They allege the Debtor's indebtedness should be excepted from discharge under § 523(a)(2)(A) because: 1) the Debtor made false statements to them regarding the purchase of a profit sharing interest in a construction project; 2) the statements were made to induce the Plaintiffs to sign the Agreement; 3) the statements were false; 4) the Plaintiffs reasonably relied on the statements as evidenced by the money changing hands; and 5) the statements were made recklessly and knowingly with the intent to deceive.[21] In the alternative, the Plaintiffs allege the Debtor's indebtedness should be excepted from discharge under § 523(a)(2)(B) because the debt evidenced by the Note is a debt obtained by use of a writing, made with the intent to deceive, which was materially false, respecting the Debtor's financial condition, on which the Plaintiffs reasonably relied.

On November 13, 2009, the Debtor timely filed his Answer, denying any wrongdoing. The Debtor did not assert any counterclaims or cross-claims in his Answer, but raised the following affirmative defenses: 1) failure to state a claim upon which relief may be granted; 2) the Plaintiffs failed to mitigate damages; 3) the claims are barred by the statute of limitations; 4) doctrine of laches; 5) the claims are barred by Statute of Frauds; 6) no consideration;

---

[17] Docket No. 1.

[18] Complaint, at ¶ 2; Answer, at ¶ 2.

[19] *See* Plaintiffs' Proof of Claim No. 11-1 filed in the Debtor's underlying bankruptcy case.

[20] Complaint, at ¶ 31. Based on the subsequent pleadings filed by the parties, the Court notes the Plaintiffs asserted a claim under § 523(a)(2)(A), and an alternative claim under § 523(a)(2)(B).

[21] Plaintiffs also allege they were investors and the arrangement between the parties constitutes a profit sharing agreement, and a security under COLO. REV. STAT. § 11-51-20(17). However, Plaintiffs did not assert any claim under § 523(a)(19) for securities fraud.

7) contributory negligence; and 8) the Plaintiffs' reliance on alleged representations was not reasonable or justifiable.

## DISCUSSION

It is undisputed the parties entered into the Agreement and the Note, the Debtor paid only $15,000 to Plaintiffs in connection with the Note, the Debtor defaulted under the terms of the Note, and the Debtor owes the Plaintiff the principal amount of $220,000 under the terms of the Note. The parties also stipulated the Plaintiffs are creditors of the Debtor. Based on these stipulated facts and the plain language of the Agreement and the Note, the evidence clearly establishes the Debtor owes a debt to the Plaintiffs for money loaned under the Agreement.[22]

### A. Plaintiffs' Claim for Relief Under § 523(a)(2)(A)

Section 523(a)(2)(A) of the Bankruptcy Code states in relevant part:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--
>
> . . .
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--
>
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. . .

To prove the debt is nondischargeable under § 523(a)(2)(A) for false pretenses, false representation, or actual fraud, Plaintiffs must show the following elements:

- the debtor made a false representation of fact,
- the fact was material,
- the debtor made the representation knowing it to be false,
- the debtor made the representation intending the creditor's reliance,
- the creditor relied upon the representation,

[22] Despite the use of the defined term "Investor" in the Agreement, the Court finds the Agreement unambiguously provides for the Plaintiffs to loan money to the Debtor in connection with the Project. Neither the terms of the Agreement nor the testimony of the parties at trial established the arrangement between the parties was for the sale of a security.

- the reliance was justifiable, and
- the reliance resulted in damage to the creditor.[23]

The Plaintiffs bear the burden of proving each element by a preponderance of the evidence.[24]

*1. Whether the Debtor made a false representation of material fact, knowing the representation was false.*

This adversary proceeding centers on two key documents, the Agreement and the Note, copies of which were admitted by stipulation of the parties.[25] At issue is the representation made by the Debtor to the Plaintiffs that he had obtained "pre-sales" of single family homes in the Project. Although the Debtor admitted at trial he made such a representation on multiple occasions, the parties differ on their interpretation of the term "pre-sales" as used by the Debtor. Regardless of the meaning, the term "pre-sales" was a material fact regarding the transaction between the Debtor and the Plaintiffs. There is no question the Debtor represented he had obtained pre-sales, and the Court concludes the representation was regarding a material fact.

Plaintiffs claim to have been misled prior to entering into the Agreement and the Note, testifying they understood "pre-sales" to mean the Debtor had fully executed contracts for purchases and sales. Although there was no clear explanation from Plaintiffs as to exactly what the Debtor told them at the two meetings prior to signing the Agreement, the Agreement clearly states, "In order to induce [Plaintiffs] to execute this agreement and to provide funds for the Project, [Debtor] warrants . . . [Debtor] has obtained four presales of single-family homes in the Project and has obtained executed purchase and sale contracts signed by the purchasers."[26] The Plaintiffs argue "pre-sales" means the Debtor had signed contracts for homes to be built in that Project. The Court agrees. Based on the plain language in the Agreement, the Court determines the meaning of the term "pre-sales" was purchase and sale contracts for homes in the Project.

---

[23] *Field v. Mans*, 516 U.S. 59, 70 (1995); *Fowler Brothers v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996); *Martino v. First Citizens Bank & Trust Co.*, 2012 WL 1945424, at *2 (Bankr. D. Colo. 2012).

[24] *Grogan v. Garner*, 498 U.S. 279, 286 (1991).

[25] *See Minutes of Proceeding* from July 17, 2012 (Docket No. 75).

[26] Agreement, Plaintiff's Exhibit 1, at p.3-4, ¶ 14.

The Debtor admitted he represented to Plaintiffs four homes in the Project were "pre-sales," but testified he believed the term "pre-sales" meant potential buyers had only reserved the right to purchase lots and could walk away at any time. As stated above, the plain language in the Agreement does not support the Debtor's belief. The Debtor testified the Agreement and the Note were drafted by counsel for the Plaintiffs, and provided to the Debtor for review and comment prior to execution at the meeting on March 8, 2006. However, the Debtor also admitted he merely "scanned" the Agreement prior to signing, and did not see the warranty he held four purchase and sale contracts for homes at the Project. Moreover, the Debtor admitted that particular warranty was "false" and further testified he never had executed purchase and sale agreements for any single family homes at the time the Agreement and Note were executed. As such, the Court determines Plaintiffs have demonstrated the Debtor's representation was not only false, but the Debtor knew it was false at the time the Agreement was executed.

Accordingly, the Court finds the Debtor's representation to Plaintiffs he had four contacts for pre-sold homes constitutes a false representation of material fact for purposes of Plaintiffs' claim under § 523(a)(2)(A). In addition, the Court concludes the Debtor made the representation knowing the representation was false.

*2. Whether the Debtor acted with the intent to deceive Plaintiffs.*

The next fraud element requires the Court to determine whether the Debtor possessed the intent to deceive the Plaintiffs. The Bankruptcy Appellate Panel for the Tenth Circuit Court of Appeals has held, "[i]ntent to deceive under [§ 523(a)(2)(A)] may be inferred from the totality of the circumstances, and includes reckless disregard of the truth. Moreover, the scienter requirement may be established by material omissions."[27]

Here, the Debtor's representations regarding pre-sales was not true. The "totality of the circumstances" includes the Debtor's need for funds to develop and construct the Project, the Debtor's request for loaned funds from Plaintiffs in exchange for the Note, the Debtor's failure carefully to read the Agreement before signing or provide any changes to the Agreement, and the Debtor's material misrepresentations on several occasions regarding the pre-sales.

The Debtor argues he inadvertently executed the Agreement warranting he obtained executed purchase and sale contracts, and he never intended to deceive the Plaintiffs. On the contrary, the Debtor simply did not read the warranty prior to signing the Agreement. Further, the Debtor testified his

---

[27] *In re Daviscourt*, 353 B.R. 674, 685 (10th Cir. BAP 2006).

interpretation of "pre-sales" was lot reservations. However, the Debtor also testified he never read the lot reservation documents supporting his interpretation.

The Debtor's failure to study the relevant documents and voice any concerns before signing the Agreement is fatal to the Debtor's claim of inadvertence. At a minimum, the Debtor's conduct constitutes a reckless disregard of the truth of the representations contained in the Agreement. Based on the totality of the circumstances, the Court finds the Debtor acted with the requisite intent to deceive the Plaintiffs.

*3. Whether Plaintiffs' relied on the false representation.*

Under the next element, the Court must determine whether the Plaintiffs relied on the false representation. The Plaintiffs testified they agreed to provide the funds to the Debtor because they wanted to earn a quick profit and had no reason not to trust the Debtor. However, they also both testified the representation regarding pre-sales was a "huge" reason they loaned the money to the Debtor. That is, had the Plaintiffs known the Debtor had not pre-sold a single home in the Project, they would not have agreed to loan the Debtor any money in exchange for the Note. Thus, the Court finds the Plaintiffs relied on the Debtor's false representations.

*4. Whether Plaintiffs' reliance was justifiable.*

As noted by Chief Judge Howard R. Tallman of this Court,

> The *Fowler Bros.* Court used the term "reasonable" reliance, but the Supreme Court has held that § 523(a)(2)(A) requires justifiable, and not reasonable, reliance in the case of *Field v. Mans*, 516 U.S. 59, 74, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). This Court will apply that standard rather than the reasonable reliance standard articulated in *Fowler Bros. v. Young*. In order for the Plaintiff to have justifiable reliance on a representation under 11 U.S.C. § 523(a)(2)(A), the Plaintiff need only perform a cursory inspection of the representation to the extent that it should be very obvious that the representation is fraudulent. *Field v. Mans*, 516 U.S. 59, 71, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). Justifiable reliance is not reasonable reliance, so the objective reasonable person standard does not apply; it is merely what a cursory examination of the representation would uncover. *Id.* at 72, 116 S.Ct. 437.[28]

[28] *In re Sutherland-Minor*, 345 B.R. 348, 354, n.4 (Bankr. D. Colo. 2006). *See also Fowler Brothers*, 91 F.3d at 1373 and *Field v. Mans*, 516 U.S. at 74.

The Plaintiffs secured their Note against three condominium properties owned by the Debtor at a different project, none of which were located at the Project. The Plaintiffs admitted there was little to no equity in the three condominiums, but they anticipated an increase in value given the real estate market at that time. The Plaintiffs did not request a deed of trust or additional security for the Note against the Project. The Court acknowledges the Plaintiffs could have requested further information on the pre-sales, including copies of the alleged purchase and sale contracts. The Plaintiffs admitted those documents were not requested and no investigation on purchase and sale contracts was conducted.

However, the Plaintiffs stated they relied on the multiple representations of the Debtor and the warranty in the Agreement regarding the contracts. Further, the Plaintiffs testified they asked the Debtor to describe the meaning of the term pre-sale at their meeting in February, and the Debtor replied the term meant he had executed contracts for the sale of homes. The Debtor relies solely on the Plaintiffs' failure to request the contracts or lot reservation documents from the Debtor as evidence the Plaintiff's reliance was not justifiable, despite the undisputed fact the Debtor represented he had pre-sales on multiple occasions and warranted he obtained the contracts.

In this case, the Court finds, based on the credibility of the testimony at trial, the Plaintiffs established they had no reason to suspect the falsity of the Debtor's representations regarding pre-sales. In making this determination, the Court relies most heavily on the Agreement. Even if the parties had different interpretations for the term "pre-sales," the Agreement signed by the parties resolved any misunderstanding with respect to that term. Further, even if the Debtor did not receive a copy of the Agreement until the closing on March 8, 2006, which the Plaintiffs dispute, the Debtor never asked for additional time to read the Agreement. The Court finds the Plaintiffs relied on the Debtor's seemingly straightforward statements he had pre-sold four homes. This representation was expressly included in the Agreement between the parties. Under the circumstances of this case, the Court finds Plaintiffs' reliance was justifiable.

5. *Whether the false representations resulted in damages to Plaintiffs.*

As explained by the United States Bankruptcy Court for the Northern District of Oklahoma, Plaintiffs must show their loss was proximately caused by their justifiable reliance on the Debtor's false representation:

> The "obtained by" language of § 523(a)(2)(A) represents the causation element of the fraud claim-that is, the debt (for loss or damage) sought to be excepted from discharge must have been "obtained by," or proximately caused by, justifiable reliance upon the non-disclosure. *See, e.g., Ghomeshi v. Sabban* (*In re Sabban*), 600 F.3d 1219, 1223 (9th Cir. 2010). *See also Hernandez v. Musgrave* (*In re Musgrave*), 2011 WL 312883 at * *9–11 (BAP 10th Cir., Feb. 2, 2011) (explaining proximate cause as a "direct link" between the misrepresentation and the debt sought to be excepted from discharge, *i.e.*, the misrepresentation must be a "'substantial factor in determining the course of conduct that results in [the] loss'" and the loss must be "'reasonably . . . expected to result from the reliance'," *quoting* Restatement (Second) of Torts §§ 546 and 548A, respectively, and concluding that the damages claimed by the creditor were not proximately caused by the misrepresentation).[29]

As discussed above, the Plaintiffs testified they never would have loaned money to the Debtor for the Project if they had known the Debtor did not have executed purchase and sale contracts. Further, the Plaintiffs each testified the representations regarding pre-sales were substantial factors in the decision to loan the Debtor the funds. With no equity left in the Project and the Debtor's bankruptcy pending, the balance of the Plaintiffs' Note remains unpaid and at risk of discharge. For these reasons, the Court determines the Debtor's repeated false representations resulted in damages to the Plaintiffs.

---

[29] *In re Seeberger*, 2011 WL 6749049, *21 (Bankr. N.D. Okla. 2011). *See Sanchez v. Lovato* (*In re Lovato*), 442 B.R. 810, 816 (Bankr. D. N.M. 2011) ("*Bastian* and the other authorities cited above show that a Plaintiff must demonstrate a direct link between the misrepresentation and the actual damages suffered. 'But for' causation alone is not enough."). *See also Woodstock Housing Corporation v. Johnson* (*In re Johnson*), 242 B.R. 283, 292 (Bankr. E.D. Pa. 1999) stating as follows:

> As *Field* teaches, § 523(a)(2) requirements must be determined under common law tort principles. For this reason, a damage requirement is uniformly read into § 523(a)(2)(A), even though no express inclusion of such a requirement appears in the text of that Code section. We attribute the presence of the requirement that "resulting injury" proximately caused by alleged fraudulent conduct is included as a requirement in a § 523(a)(2)(A) claim to the fact that this is an element which is necessary for the proof of common law fraud generally.

Based on the totality of the circumstances, the Court finds the Debtor made false representations, with the requisite intent to deceive, and that Plaintiffs justifiably relied on the representation resulting in damages to them. Therefore, the debt owed to Plaintiffs is excepted from the Debtor's discharge pursuant to § 523(a)(2)(A).

**B. Plaintiffs' Claim for Relief Under § 523(a)(2)(B)**

Section 523(a)(2)(B) provides:

> A discharge under section 727. . . of this title does not discharge an individual debtor from any debt--
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . .
>
> (B) the use of a statement in writing–
>
> (i) that is materially false;
> (ii) respecting the debtor's or an insider's financial condition;
> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
> (iv) that the debtor caused to be made or published with intent to deceive. . .[30]

Plaintiffs provided no evidence the Debtor used a statement in writing regarding the **<u>Debtor's</u>** financial condition to obtain the loan from the Plaintiffs. At issue were the Debtor's representations regarding pre-sales of homes in the Project. The documents admitted into evidence arguably relating to financial condition related to the Debtor's projected profit and costs for construction of the Project, not to the Debtor's financial condition or the financial condition of his company.[31] Accordingly, the Court finds the Plaintiffs' claim for relief under § 523(a)(2)(B) must be denied.

---

[30] § 523(a)(2)(B); *Bellco First Federal Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1359 (10th Cir. 1997); *Cousatte v. Lucas (In re Lucas*), 300 B.R. 526, 531 (10th Cir. BAP 2003); *Cadwell v. Joelson (In re Joelson)*, 307 B.R. 689, 692 (10th Cir. BAP 2004), *aff'd,* 427 F.3d 700 (10th Cir. 2005).

[31] *See* Plaintiffs' Exhibits 7 and 8.

## C. Calculation of Damages.

Plaintiffs request damages in the amount of $220,000.00 (the principal amount of the debt), plus interest, attorneys' fees and costs.

*1. Principal*

The Debtor admits he is indebted to the Plaintiffs in the principal sum of $220,000.00.[32] The Court will enter judgment for false representations under § 523(a)(2)(A) for the remaining principal amount owed under the Note in the total amount of $220,000.

*2. Interest.*

Interest is provided for in the Note as follows:

> If any payment required by the Note is not paid when due, or if any default under and Deed of Trust securing this Note occurs, the entire principal amount outstanding . . . shall at once become due and payable . . . and the indebtedness shall bear interest at the rate of 18 percent per annum from the date of default.[33]

Although the parties stipulated the Debtor defaulted under the terms of the Note, there is no evidence before the Court as to the exact date of default in September 2008. The Court will allow pre-judgment interest at the interest rate of 18% per annum, as provided in the Note, starting from the date of default through the date of Judgment in this case. Post-judgment interest will run at the federal judgment interest rate under 28 U.S.C. § 1961.

*3. Costs and Attorneys' Fees.*

The Court notes the Plaintiffs argue they are entitled to recover attorneys fees by virtue of the Colorado securities fraud statute, COLO.REV.STAT. 11-51-601(1). This Court finds the transaction at issue **does not** involve the "sale of a security," and the transaction between the parties was a loan, not an investment. Indeed, the Agreement expressly provides the Plaintiffs would loan the Debtor the sum of $235,000.00 to be repaid under the terms of the Note. Therefore, the Court finds the Debtor did not violate the Colorado securities fraud statute, and an award of attorneys' fees under this statute is improper.

---

[32] Complaint, at ¶ 26; Answer, at ¶ 26; SPS, at ¶ 9.

[33] Note, Plaintiff's Exhibit 2, at ¶ 4.

The Plaintiffs also assert they are entitled to attorneys' fees under the terms of the Note. The Court agrees. Attorney's fees are provided for in the Note as follows: "The Note Holder shall be entitled to collect all reasonable costs and expense of collection and/or suit, including but not limited to reasonable attorneys' fees."[34]

*4. Total Judgment.*

The Court will enter a final judgment in this matter after the final determination of interest, attorneys' fees and costs.

**CONCLUSION**

For the reasons stated above,

IT IS ORDERED the debt of the Debtor to the Plaintiffs in the principal amount of $220,000 is hereby found to be nondischargeable under 11 U.S.C. § 523(a)(2)(A).

IT IS FURTHER ORDERED that JUDGMENT shall enter against the Debtor Ken McKinney doing business as Euro Construction, Inc. and in favor of Plaintiffs Mark Butman and Steve Cleary in the amount of $220,000.00, plus pre-judgment interest at 18% per annum, commencing from the date of default under the terms of the Note, up to the date of the final judgment in this case. Thereafter interest shall accrue on this sum as provided by 28 U.S.C. § 1961.

IT IS FURTHER ORDERED that, on or before October 16, 2012, Plaintiffs shall file a proposed computation of pre-judgment interest, as provided in the Note, calculated from the date of default through October 16, 2012, identifying the per diem rate used in making such computation. The Plaintiffs must also provide evidence of the exact date of default in September 2008. The Debtor shall have fourteen (14) days thereafter to file any objection he may have to the Plaintiffs' calculation of interest.

IT IS FURTHER ORDERED that, on or before October 16, 2012, the Plaintiffs shall file an affidavit of attorneys' fees and a separate bill of costs containing their total attorney fees and expenses in connection with this case. The Debtor shall have fourteen (14) days thereafter to file any objection he may have to Plaintiffs' affidavit of fees and bill of costs.

Upon the Court's determination of allowable interest, attorneys' fees and expenses, the Court will enter its final judgment in this matter. This Order is

---

[34] Note, Plaintiff's Exhibit 2, at ¶ 4.

interlocutory and appeal deadlines will not begin to run until the Court's final judgment is entered.

Dated October 2, 2012

BY THE COURT:

Michael E. Romero
United States Bankruptcy Judge